IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

CHRISTOPHER EUGENE DE ROSSITTE                                      PLAINTIFF

v.                                   Civil No.6:17-cv-06043

CORRECT CARE SOLUTIONS, INC.,
DR. NANETTE VOWELL, and NURSE
MELISSA L. GIFFORD                                                  DEFENDANTS

## REPORT AND RECOMMENDATION

Before the Court is a Motion for Summary Judgment filed by Defendants Correct Care

Solutions, LLC, Dr. Nannette Vowell, and Melissa Gifford.  (ECF No. 151).  Plaintiff Christopher

Eugene De Rossitte has a filed a Response.  (ECF No. 114).  Defendants have filed a Reply.  (ECF

No. 116).  Plaintiff filed a Sur-Response to Defendants' Reply.  (ECF No. 123).  Pursuant to the

provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Robert T. Dawson, United States

District Judge, referred this case to the undersigned for the purpose of making a Report and

Recommendation.

## I.  PROCEDURAL BACKGROUND

Plaintiff is currently incarcerated in the Arkansas Department of Correction ("ADC")

Ouachita River Unit ("ORCU").  Plaintiff filed his initial Complaint on May 4, 2017.  (ECF No.

1).  The following day, the Court ordered Plaintiff to file an Amended Complaint to state his claims

against each defendant with factual specificity on the Court's approved § 1983 form.  (ECF No.

7).  On June 12, 2017, Plaintiff filed an Amended Complaint but failed to use the Court's form as

directed to clearly indicate what claims Plaintiff was making against each Defendant.  (ECF No.

11).  On August 21, 2017 the Court directed Plaintiff to file a Second Amended Complaint on the

1

court-approved § 1983 form.  (ECF No. 13).

Plaintiff filed a Second Amended Complaint on September 5, 2017, naming Correct Care Solutions, Inc. ("CCS"), Dr. Nannette Vowell, Nurse Melissa L. Gifford, Andrea Beasley, Gwendolyn Hart, Richard Morgan, Rory Griffin, Wendy Kelly and Nichole A. Robinson as Defendants.  (ECF No. 14).  He asserted claims based on denial of medical care, retaliation, discrimination under the Americans with Disabilities Act, and a claim under state law for medical injury.  *Id.*  Plaintiff's claims against Defendant Kelley and the claim regarding the Americans with Disabilities Act were dismissed on April 19, 2018.  (ECF No. 67).  On October 25, 2018, Plaintiff's claims against Rory Griffin, Gwendolyn Hart, Andrea Beasley, Richard Morgan and Nicole Robinson were also dismissed.  (ECF Nos. 120, 121).  The only remaining Defendants in this lawsuit are CCS, Vowell and Gifford.

In his Second Amended Complaint, Plaintiff alleges CCS, Vowell and Gifford denied him adequate medical care in violation of the Eighth Amendment.  Specifically, he claims:

> The plaintiff, for over two and half years, has and continues to suffer from a frequently debilitating and always painful condition (likely a bacterial infection, MRSA).[1] Symptoms include many NEVER addressed by ANY CCS staff person despite dozens and dozens of sick calls, requests and grievances: constant pain in tissues of face and head; frequent, usually daily headaches, mild to severe; excessive thirst; difficulty swallowing; recurrent boils and bumps on face; recurrent swelling of eyelids; earaches; muscle weakness and pain; shortness of breath, persistent and recurrent rashes; urine irregularities; poor blood work labs; bouts of nausea.  And also includes a few INEFFECTIVELY addressed symptoms: constant eye pain and irritation; build-up of irritants under eyelids resulting in sleep deprivation; blurred, cloudy and dimmed vision; constant sinus trouble; recurring cough; recurring sore throat; edema on arms. Possible long-term health issues and permanent vision damage may already have resulted.

> (ECF No. 14, pp. 4, 8).

---

[1]MRSA is a drug-resistant strain of staph bacteria.

Plaintiff alleges Defendant Vowell has "repeatedly been informed of and seen the plaintiff for these symptoms listed above and refused to diagnose, order reasonable diagnostic tests or seek to remedy the plaintiff's pain and suffering…" *Id.* Plaintiff also states Defendant Gifford has "repeatedly refused to address or acknowledge the plaintiff's pain and suffering noted above and, refused to act upon it." *Id.* Plaintiff also attached thirty-nine (39) grievances totaling one-hundred twenty-seven (127) pages to his Second Amended Complaint. (ECF No. 14-1, pp. 1-127). Although not specifically referred to in the body of the complaint, these grievances encompass additional claims for denial of medical care for a delay in providing him with hearing aids and batteries (*Id.* at pp. 1, 5, 8, 11, 14), being examined in his boxer shorts (*Id.* at p. 33), being denied reconstructive surgery for his right ankle (*Id.* at p. 45), failure to renew scripts for various items (i.e. extra blanket, double mat) (*Id.* at p. 54, 66), delay in making an appointment with an ophthalmologist, delay in reviewing the findings of the ophthalmologist and failure to follow recommendations of the ophthalmologist (*Id.* at pp. 65, 73, 86).[2]

Plaintiff also asserts a retaliation claim against Defendants Vowell and Gifford. He alleges Defendant Vowell retaliated against him for seeking "redress and legal action" and "refused to renew or rescind necessary medications and medical authorizations others then had to restore…" He states Defendant Gifford retaliated against him for seeking "redress" by casting "aspersions upon his character with false statements and further denied medical care." *Id.* at p. 5.

Plaintiff also asserts a claim under state law for medical injury. He states the conduct of Defendants Vowell and Gifford described in his claims for denial of medical care and retaliation

---

[2] Six (6) grievances attached to Plaintiff's Second Amended Complaint will not be addressed in this Report and Recommendation because they involve issues concerning claims previously dismissed or individuals who are no longer defendants in this lawsuit. (ECF No. 14-1, pp. 97, 110, 113, 116, 121, 125).

constitute medical injury under state law.

As for Defendant CCS, Plaintiff claims the "aggressive cost-cutting policies of CCS are such to encourage CCS staff (Vowell, Gifford), to betray Hippocratic Fiduciary responsibilities, habituating staff to NOT seek diagnostic tests or treatments if inaction (institutionalized deliberate indifference) is perceived to be without monetary cost or consequence." (ECF No. 14, p. 5).  He also states CCS refused to act when Plaintiff wrote their corporate headquarters asking they provide him with needed medical care.  *Id.*  at p. 9.  He also claims the hearing aid battery replacement policy caused him to suffer unnecessary delays in receiving the batteries.

On May 13, 2019, Defendants filed the instant summary judgment motion stating, "The evidence before the Court reveals that Plaintiff cannot establish cognizable civil rights claims for deliberate indifference to serious medical needs.  Likewise, Plaintiff cannot establish cognizable claims for medical malpractice … or for retaliation."  (ECF No. 151, p. 2).  They go on to state there are no genuine issues of material fact, Plaintiff's medical issues are not serious conditions, and he has received appropriate care.  *Id.* at p. 2.  In support of their motion, Defendants have submitted a Statement of Facts (ECF No. 152), a Brief in Support of their motion (ECF No. 153), one-thousand eight-hundred sixty-two (1,862) pages of Plaintiff's medical records (ECF No. 152 -1,2,3,4,5,6,7,8,9,10,11,), Plaintiff's deposition testimony (ECF No. 152-12), and affidavits from two expert witnesses – Dr. Jeffrey Stieve and Dr. Albert Kittrell.  (ECF No. 152-13, 152-14).

On July 1, 2019, Plaintiff filed a Response to Defendants' motion (ECF No. 158), a Brief in Support (ECF No. 159), and a Statement of Facts.  (ECF No. 160).  Plaintiff argues Defendants denied him medical care when they failed to "fully investigate and diagnose" the source of various symptoms he believes are evidence of "some systemic malady…likely an infection".  (ECF No.

158, p. 1).  He argues his medical issues are serious medical needs and he specifically disputes the opinions of Defendants' experts which conclude in part Plaintiff suffers from an illness anxiety disorder.  *Id.* at p. 2.  On July 8, 2019, Defendants filed a Reply.  (ECF No. 161).  On July 22, 2019, Plaintiff filed a sur-response to the Reply.  (ECF No. 162).  The Court has thoroughly reviewed the pleadings and all proffered summary judgment evidence.

## II. FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the relevant facts are as follows.  Plaintiff was arrested in 2008 and incarcerated in the ADC in 2009.  (ECF No. 152-12, p. 9).  When Plaintiff arrived at the ADC, he suffered from several pre-existing conditions including depression, chronic acid reflux, hearing loss which began in his twenties, and a broken back and ankles sustained in an apparent suicide attempt in 2008 which left him confined to a wheelchair.  (ECF No. 152-12, pp. 13, 22).  Plaintiff received hearing aids in 2010 while he was incarcerated in the ADC unit for special programs in Pine Bluff, Arkansas and underwent hernia surgery.  *Id.* at pp. 27, 30.  At some point thereafter, possibly in 2011, Plaintiff began to wear reading glasses.  *Id.*

Plaintiff was transferred to the ORCU in 2014.  At all times since his incarceration there, Plaintiff has been a chronic care patient participating in chronic care clinics where he was evaluated on a regular basis.  He also had his blood tested every three to six months as part of his chronic care regimen.  According to the ADC's Clinician's Chronic Care Form, on November 20, 2014, Plaintiff's list of medications included:  Polyvinyl Alcohol Opth Sol (15MI Btl)/1.4%; Calcium Carbonate Antacid Tab Chewable/500MG; Aspir-Low Tab Dr/81MG; Tamsulosin Hcl Caps Er 24 Ho/0.4mG; Omega 3 Caps/1000Mg; Buspirone Hcl Tab/10MG; Acetaminophen Tab/325MG; Nortriptyline Hcl Caps/50MG; Cimetidine/Tablet/400MG; Polyethylene Glycol

3350/Power; Nortriptyline/50MG; Simethicone/ Chew Tab/80 MG; Naproxen/Tablet/500MG; Calcium Carbonate/Tablet1250MG.  (ECF No. 152-1, p. 263).

### A. Plaintiff's Grievances

Between March 1, 2015, and April 22, 2017, Plaintiff submitted seventy-four (74) formal medical grievances.[3]  However, only the grievances relating to denial of medical care or retaliation attached to Plaintiff's Second Amended Complaint will be addressed in this Report and Recommendation.

On February 4, 2015, Plaintiff submitted a grievance complaining he had been suffering, for more than a year, with "constant" symptoms including eye irritation, severe dimmed vision, "sunburnt" feeling skin of face/head, rashes, painfully dry yet clogged sinuses, and oddly colored urine.  He also stated the following symptoms were recurrent:  headaches, dehydration, blurred vision from eye irritation, boils on the face painful itch bumps on face and forehead, and swelling eyelids.  (ECF No. 14-1, p. 17).  Upon reviewing Plaintiff's records, the Health Services Administrator found Plaintiff had been previously seen multiple times for a variety of these complaints.  It was noted Plaintiff had a chronic care visit and sick call on November 12, 2015.  *Id.,* (ECF No. 152-3, p. 61-62).  At this visit Defendant Vowell performed a comprehensive eye exam which revealed no sign of infection or damage to Plaintiff's eyes.  *Id.*  Plaintiff was also seen at sick call on December 3, 2015, for a complaint of eye infection. (ECF No. 152-3, pp. 55-56).  An exam was performed and no infection was noted.  Plaintiff was seen again on December 29, 2015, in response to Plaintiff's claims that his eyes were irritated and his arms were infected.  Plaintiff was assessed and found to have no abnormal findings. *Id.*

---

[3] These grievances encompass two-hundred forty-nine (249) pages.  (ECF No. 98-2).

Between February 15, 2016, and July 29, 2016, Plaintiff submitted five (5) grievances related to his hearing aids and batteries.  (ECF No. 14-1, pp. 1, 5, 8, 11, 14).  He complains he was forced to go without a working hearing aid for over ten (10) months and hearing aid batteries were not distributed in a timely manner causing him to have long delays without functioning hearing aids.  *Id.*

On October 7, 2015, Nurse Watts submitted a consult with Affordable Hearing indicating Plaintiff had requested his hearing aid be fixed or replaced.  (ECF No. 152-1, p. 95).  This consult was approved but an appointment was not made for Plaintiff to be seen.  On April 14, 2016, in response to a sick call regarding replacement of a hearing aid Plaintiff claims CCS staff lost, Nurse Watts notes, "the first one [hearing aid] that was sent off wasn't lost it was damage past repair. We have tried to replace/fix the one that you have – you refused to allow them to send it for further repair."  (ECF No. 152-1, p. 120).  Plaintiff was seen by audiology on June 9, 2016 and returned to the ORCU wearing his right-side hearing aid.  (ECF No. 152-1, p. 137).   On August 31, 2016, Plaintiff received a new hearing aid.  (ECF No. 152-1, p. 148).  On October 27, 2016, Plaintiff returned from an outside appointment for audiology at Affordable Hearing.  Defendant Gifford noted, "wearing bilateral hearing aids, states can hear very well now."  (ECF No. 152-1, p. 155). Between March 18, 2015 and May 16, 2017, Plaintiff received hearing aid batteries twenty-four (24) times in response to his requests.  (ECF 152-1, pp. 65, 71, 82, 87, 95, 140, 153, 173, 191, 302, 421-428, 430-431, 511, 526-528).

On April 20, 2016, Plaintiff submitted two grievances complaining Defendant Gifford had retaliated against him by forcing him to fill out eight (8) separate sick calls for various symptoms for which Plaintiff had been previously seen, instead of just submitting one call for all the

symptoms.  (ECF No. 14-1, pp. 21, 29).  The response to these grievances indicated his claims of retaliation and harassment were investigated and there was no evidence to support his allegations. *Id.*

On April 20, 2016, Plaintiff also submitted a grievance complaining Defendant Vowell had not allowed him to speak or ask questions during an examination on April 15, 2016, when he tried to tell her the antibiotic "Cephalex" worked before but his problems came back after the medicine "ran out".  (ECF No. 14-1, p. 24).  He stated, "these cuts on my arms…have not healed…still painful".  The response to this grievance states, "Per Dr. Vowell's clinical examination & judgment, your scars are not infected." *Id.*

On April 29, 2016, Plaintiff submitted a grievance stating Defendants Vowell and Gifford retaliated against him when they required him to "strip to his boxers" to be examined on April 15, 2016, for rashes on his arm, elbow and inner upper thigh that had been previously shown to them during other sick calls.  (ECF No. 14-1, p. 33).  The response to this grievance states, "I [R. Morgan] was present for the examination.  Dr. Vowell and Nurse Gifford were present also.  Your wheelchair was parked with your back to the opening of cubicle.  You agreed to the examination. You remained in your boxer shorts at all times…" *Id.*

That same day, Plaintiff submitted another grievance stating on April 15, 2016, he provided a urine sample to test for possible infection.  Plaintiff states the only "measure was Ph & specific gravity…only when Im very hydrated and the 'yellow' thins out - rather than becoming more clear, it takes on a greenish tint.  Are you going to do an actual test for infection?"  (ECF No. 14-1, p. 36).   The medical records reflect a urinalysis (dipstick) test was done on Plaintiff's urine noting "clear…no odd odor noted."  (ECF No. 152-1, p. 449).  In addition, the response to this grievance

states, "The provider ordered a cbc temp test [on April 7, 2016]. These are blood tests which showed no infection." *Id.,* (ECF No. 152-1, pp. 450-453).

On May 26, 2016, Plaintiff submitted a grievance complaining he had not heard back on a sick call he submitted "over the weekend" concerning his eyes being infected. (ECF No. 14-1, p. 39). The response reads, "You were seen on 5-26-16 about this issue. Continue current treatment; awaiting further orders from provider." *Id.*

On July 4, 2016, Plaintiff submitted a grievance again complaining CCS staff had not addressed and had concealed from him, "Below Low Normal" MCH and MCHI results…Please do something about this issue." (ECF No. 14-1, p. 42). The response to this grievance states, "This has been addressed multiple times in grievance after grievance about the same issue." *Id.* The medical department responded:

> MCH is a abbreviation for mean corpuscular hemoglobin. MCH is the average mass of hemoglobin per red blood cell in sample of blood. The normal range is 26.6 to 33.0. Your 5/12/16 MCH lab was 26.1. Your 8/3/16 MCH lab was 25.9. These are both just below the normal range. The provider is aware and no new orders at this time. MCHC is the abbreviation for mean corpuscular hemoglobin concentration. The normal range is 31.5 to 35.7. Your 8/3/16 lab was 31.8 which is normal. The 5/12/16 lab was 30.9 just below the normal range. The provider is monitoring these labs. That is why we draw chronic care lab work. Your grievance is without merit.

(ECF No. 14-1, p. 44). In his appeal of this grievance, Plaintiff states the CCS medical department only highlighted one lab test within the acceptable range and the rest of his blood work lab tests are "not just below normal range". Plaintiff states these test results show he is suffering from an infection the medical department says he does not have. In response, Plaintiff was provided the following explanation:

> The normal range for MCH is 26.6 – 33.0 and the normal range for MCHC is 31.5

- 35.7.  A review of the last eight lab results that included MCH and MCHC indicate the following:  August 5, 2014 MCH and MCHC were within normal limits, November 12, 2014 MCH and MCHC were within normal limits, August 12, 2015 MCH and MCHC were within normal limits, November 4, 2015 MCH 26.5 and MCHC 31.0, February 5, 2016 MCH 25.9 and MCHC 31.4, April 7, 2016 MCH 25.8 and MCHC 31.2, May 11, 2016 MCH 25.9 and MCHC 31. 8, and August 2, 2016 MCH 26.1 and MCHC 30.9.  All of the above results were either within normal limits or just below the range for normal.  Your provider did not deem a follow-up medically necessary regarding the results.

*Id.,* (ECF No. 152-1, pp. 329-356, 438-470).

On July 15, 2016, Plaintiff filed a grievance regarding a sick call he claims he submitted requesting to see an orthopedic surgeon "about reconstructive replacement surgery" on his right ankle which he injured during a suicide attempt back in 2008.  (ECF No. 14-1, p. 45).  The response to this grievance states, "There is no record of a said sick call; however, I will ask you be added to the sick call list…"  *Id.*  Plaintiff appealed indicating "I don't need another sick call – you have x rays (multiple times) and have been repeatedly ignored before.  Just do something."  *Id.* at p. 46.  It was then explained to Plaintiff the medical provider "will not do elective procedure – will continue with wheelchair – as discussed previously not 'life-threatening' and Defendant Vowell did not deem it medically necessary for you to be evaluated by an orthopedic surgeon".  *Id.*

That same day, Plaintiff submitted another grievance complaining of "infected bumps on my face" he had for more than a year.  He claims Defendant Gifford has "done nothing".  (ECF No. 14-1, p. 48).  In response Plaintiff was advised, "This has been discussed numerous times.  The bumps are not infected."  *Id.*  In the response to Plaintiff's appeal it is also noted Plaintiff was examined on February 16, 2016, and no bumps were seen. Plaintiff responded, "Once again all such boils and bumps are by definition an infection.  To state otherwise is to entirely deny all medical science."  *Id.* at 49.  On October 12, 2016, the final decision on Plaintiff's appeal noted

Plaintiff had submitted a sick call dated July 9, 2016, stating he had two more bumps on his face. In response, Defendant Gifford triaged the sick call as a priority four, no face-to-face visit needed, and noted on the sick call that an occasional bump on the face is a normal occurrence advising Plaintiff to "improve your personal hygiene practices, keep your hands and fingers off of the bumps, wash your hands frequently, and to not apply any oils or ointments to your face." *Id.* at 50.

On July 29, 2016, Plaintiff again submitted a grievance complaining he was not being properly treated for his various symptoms and was being ignored. (ECF No. 14-1, p. 51). The Unit Level response stated Plaintiff was examined on June 22, 2016, and the provider documented no abnormalities to his skin. Then on June 30, 2016, Plaintiff was seen for scar "pain" on his arms and received Absorbase ointment.[4] (ECF No. 152-1, p. 140). On August 2, 2016, Nurse Hart examined Plaintiff at sick call and instructed him to stop putting Vaseline in his eyes and continue to use his prescribed eye drops. She noted Plaintiff's eyes were clear but indicated he claimed they were clear because he uses Vaseline. (ECF No. 152-1, p. 144).

On October 29, 2016, Plaintiff submitted a grievance complaining Defendant Vowell had retaliated against him by failing to renew scripts for an extra blanket, shower chair, double mat and wedge pillow. (ECF No. 14-1, p. 54). The medical records reveal Plaintiff's restrictions for a double mat, shower chair, and wedge pillow expired on September 15, 2016, along with other restrictions. Nurse Robinson entered a record review on September 29, 2016, and noted per Dr. Vowell, the following restrictions were to be issued: current ankle brace, wedge pillow, insoles, tennis shoes, wheelchair, two hearing aids, and two black and two grey hearing aid cases. (ECF

---

[4] Absorbase is a non-prescription topical ointment used as a skin therapy, protectant, and moisturizer.

No. 152-1, p. 151).  She also noted the restriction for Plaintiff's extra blanket did not expire until January 27, 2017.  (ECF No. 14-1, p. 56).   Because there was no documentation regarding his double mat or shower chair scripts, Plaintiff's appeal was found to be with merit as to these items. However, no determination was made concerning Plaintiff's claim of retaliation by Defendant Vowell.

On November 17, 2016, Plaintiff submitted a grievance complaining Defendant Gifford had retaliated against him when she entered a "no show" notation indicating he had not come to the day clinic for evaluation on November 9, 2016.  Plaintiff stated he was never called to the day clinic that day.  (ECF No. 14-1, p. 57).  This grievance, concerning the no call notation, was found with merit because there was no signed refusal from Plaintiff or staff.  *Id.*

On December 8, 2016, Plaintiff submitted a grievance stating he had been seen by Defendants Gifford and Vowell the previous day and did not receive proper medical care. Specially he states, "After almost two years (and dozens of sick calls and grievances) fighting for relief from an untreated infection…they told me they would FINALLY prescribe antibiotic eyedrops…"  He goes on to state, "I am exhausted by their incompetence and contemptuous disregard for my physical health.  I've repeatedly begged for an empirical test – a simple swab/culture! (or urine test, etc. etc.) …" to diagnose what Plaintiff believes to be MRSA.  (ECF No. 14-1, p. 60).  Plaintiff's medical records reveal he was examined and diagnosed with a corneal abrasion on December 7, 2016, using a fluorescein test and the antibiotic was prescribed to protect his eye while it healed.  *Id.* at 62, (ECF No. 152-2, pp. 139-140).

On January 24, 2017, Plaintiff filed a grievance asking, "Do I or do I not have pending appt. with an ophthalmologist?"  He states Defendant Gifford told him on December 16, 2016, he

had an appointment and then was told by another nurse he did not have one scheduled.  A response

was provided to Plaintiff stating he did have an appointment but did not specify the date.  (ECF

No. 14-1, p. 63).  Plaintiff was then advised ADC policy prohibits appointment dates or times to

be discussed with an inmate.  *Id.* at 64.

On January 24, 2017, Plaintiff submitted another grievance about his "elevate legs as

needed", extra pillow, and extra blanket scripts being denied.  He states this is "apparently yet

another example of retaliation on Dr. Vowell's part."  (ECF No. 14-1, p. 66).  The following

response was noted, "Waiting for provider review, these items expire on 1-27-17."  In the decision

addressing Plaintiff's appeal, it is noted Plaintiff's elevate legs as needed script was renewed on

February 1, 2017, by Mrs. Hart.  However, Plaintiff's script for an extra blanket for bed sores he

had suffered six years ago was not renewed because Defendant Vowell did not deem it medically

necessary at this time.  *Id.*  at p. 68.

On February 14, 2017, Plaintiff submitted another grievance complaining about the denial

of a script for an extra blanket.  (ECF No. 14-1, p. 76).  The response stated, "On 1/26/2017, day

clinic staff discussed the reason for discontinuing the extra blanket script.  The provider based her

decision on the fact that you are able to transfer without assistance and are not at high risk for skin

breakdown."  *Id.* at p. 77, (ECF No. 152-2, p. 134).  On February 23, 2017, Plaintiff submitted

another grievance stating, "I continue to be retaliated against…Dr. Vowell had refused to renew

my blanket script…despite my history."  (ECF No. 14-1, p. 83).  The response noted on February

1, 2017, a "script for elevate legs and extra blanket for his WC" was noted in Nurse Hart's notes.

She then issued a script to elevate legs but failed to mention the extra blanket.  However, on March

13, 2017, Hart issued a script for the extra blanket and pillow which "is good until March 13,

2018." *Id.* at p. 84, (ECF No. 152-2, pp. 124, 132-134).

Plaintiff submitted a third grievance on January 24, 2017, stating his prescription for Simethicone had not been renewed.  He states this is another example of retaliation by Defendant Vowell.  (ECF No. 14-1, p. 69).  The medical records confirm there was a lapse in the renewal of Simethicone for several weeks and as a result Plaintiff was given 240 Simethicone tablets on February 20, 2017.  *Id.* at p. 70.  Because of the lapse in renewal of Simethicone, Plaintiff's grievance was determined to be with merit.  However, his appeal concerning retaliation by Defendant Vowell was found to be without merit because Plaintiff did not provide the dates on which he claimed Defendant Vowell refused to renew his Simethicone and did not submit any documents supporting his contentions.  *Id.* at p. 71.

On February 7 and 14 of 2017, Plaintiff submitted grievances complaining he had submitted a request to have his artificial tears renewed and increased on January 31, 2017, because the ophthalmologist told him to increase the dose during his appointment on January 27, 2017.  He also complained the ophthalmologist prescribed flaxseed oil and an antibiotic which has also been ignored.  (ECF No. 14-1, pp. 72, 79).  In a response dated the following day it was noted, "You received your artificial tears as OPM on 2-3-17.  You received your lubrifresh p.m. ointment as a OPM on 2-7-17."  In addition, the medical department explained when Plaintiff is seen by an outside specialty, they send recommendations to the ADC providers for treatment.  "These are only recommendations and our medical providers make the final decision on your plan of care. You were already prescribed artificial tears and …lubrifresh PM…You are on fish oil at this time which is an omega fatty acid, therefore do not need the flaxseed prescribed…"  (ECF No. 14-1, p. 73).

On March 5, 2017, Plaintiff submitted a grievance stating he had reviewed his medical records and discovered on December 16, 2016 during his visit to the Optometry Clinic, the optometrist recommended he see an ophthalmologist "urgently" and should have the "soonest available" appointment.  (ECF No. 14-1, p. 86).  However, Defendant Vowell did not review the recommendation from the optometrist until January 10, 2017.  Plaintiff states because of this delay "permanent damage" to his vision occurred.  *Id.*  The response to Plaintiff's grievance states on January 10, 2017, Defendant Vowell ordered Neo-Poly-Gram Eye Drops 4 drops four times daily for 30 days and submitted Plaintiff's ophthalmology consult which was approved.  (ECF No. 152-2, p. 136).  Plaintiff was seen by the Jones Eye Clinic on January 27, 2017.  (ECF No. 14-1, p. 87).  The Health Services Administrator goes on to state, "I apologize for the delay in a provider reviewing the optometrist's recommendations.  However, this issue was resolved when Dr. Vowell reviewed the recommendations on January 10.  Dr. Vowell is authorized to implement the recommendations she deems appropriate and clinically indicated based on her clinical judgement…Your grievance had merit.  *Id.*

Plaintiff submitted another grievance on March 5, 2017, stating he has had a significant problem with his red blood cells since November 4, 2015, as evidenced by his lab work.  He also states the results of his lab work have been concealed from him for months and on March 15, 2017, Nurse Hart acknowledged there was a problem and Plaintiff was anemic.  (ECF No. 14-1, p. 90).  Health Services responded stating, "Ms. Hart, APN, saw you February 16, at chronic care clinic, but there is no mention of anemia; however, she did not[e] that she discussed your recent labs.  Your labs drawn February 1 show no indication of anemia".  *Id.* at p. 91.

On March 12, 2017, Plaintiff submitted a grievance stating he requested a new order for

his Absorbase script because it had expired, and Defendant Gifford returned the sick call as a duplicate when he had not previously requested the Absorbase be renewed.  Plaintiff states, "This is yet another retaliatory action by Dr. Vowell and Ms. Gifford.  I need my Absorbase renewed Stop cancelling and not renewing needed RX.  Renew my RX for absorbase!"  (ECF No. 14-1, p. 93).  Health Services responded stating Plaintiff was last ordered Absorbase ointment twice daily on September 28, 2016, and the script expired February 26, 2017.  "Melissa Gifford triaged your request [on March 9, 2017] Priority 4 – Face to face visit not needed; respond to request in writing." She noted "Duplicate Request".  Plaintiff was then seen on March 17, at nurse sick call, and Plaintiff requested a renewal of Absorbase for dry skin.  The nurse noted, "no flaking or redness at this time but you have multiple scars to bilateral upper extremities and some are 'thick'.  You advised that you used the Absorbase for the thick scars.  The nurse noted, "explained that med is no longer available will need to follow sick call protocol to see provider for reeval".  The response also indicates, "nurse should have referred you to provider call on March 17, for further evaluation…Your grievance is with merit, but resolving."  *Id.* at p. 94.

On March 23, 2017, Plaintiff submitted a grievance again complaining about his Absorbase not being renewed even though he had followed the sick call procedure.  (ECF No. 14-1, p. 99). The response noted the script had been renewed on May 5, 2017, after he was seen by a provider and "based on the fact that this is not a chronic care or life sustaining medication, this grievance is without merit."  *Id.* at p. 100.

On April 10, 2017, Plaintiff submitted a grievance stating Defendant Gifford retaliated against him when she listed him as a no show on Eomis when he was never called to attend the day clinic sick call.  He asks for the notation made by Gifford be "immediately erased, retracted…"

(ECF No. 14-1, p. 102).  The response states your previous "Grievance OR-16-01774 was found with merit based on the fact that there was not evidence of a refusal signed by you or staff in your medic record."  Health Services goes on to state there was no evidence Nurse Gifford falsified documentation and therefore the notation would not be removed.  *Id.* at p. 103.

On April 21, 2017, Plaintiff submitted a grievance complaining his script for a double mat had only been renewed by Defendant Vowell for three months instead of six months and she "separated" the script from his others (i.e. wheelchair, hearing aid).  Plaintiff asserts Defendant Vowell has done this to "intimidate me from filing grievances trying to get treated for an infection she refuses to treat."  (ECF No. 14-1, p. 105).  Plaintiff states Defendant Vowell intentionally separated out his script for a double mat as a threat to him.  Health Services responded stating, the providers at the ORCU determine Plaintiff's medical needs based on their assessment and parameters for scripts or special equipment are at the provider's discretion.  The providers determine how long an inmate will be given permission to possess these items.  Plaintiff's extra mat script was not included with the wheelchair or hearing aids scripts in the past.  "This grievance is without merit."  *Id.* at p. 106.  That same day, Plaintiff submitted another grievance complaining again he was being retaliated against by Defendant Vowell for only renewing his double mat script for three months.  (ECF No. 14-1, p. 108).  The appeal of this grievance was found without merit stating, "Dr. Vowell ordered the treatment she deemed medically indicated based upon her medical judgment…"  *Id.* at p. 109.

**B. Plaintiff's Deposition Testimony**

On January 17, 2017, Plaintiff testified under oath at his deposition.  (ECF No. 152-12, pp. 1-202).  He states the claims in this lawsuit begin in March of 2015 when "essentially…Dr. Vowell

and Nurse Gifford decided they just were not going to acknowledge my complaints anymore and try to figure out what was going on."  (ECF No. 152-12, p. 45).  Plaintiff states Defendant Gifford "was never very pleasant with me" and "in March of 2015 she recorded facts that were not accurate."  *Id.* at pp. 45-46.  Plaintiff claims there have been "gaps here and there for one reason or another that it's [acetaminophen and naproxen] been taken away or not renewed from usually just a few weeks until I file enough grievances that I get it back.  And that's happened repeatedly." (ECF No. 152-12, p. 35).  "More often than not it's been getting an order renewed that's been the problem."  *Id.*  However, he testified he has always had nortriptyline and other medication for pain prescribed for him between 2015 and May of 2017.  *Id.* at pp. 33-34.

Plaintiff testified in the spring of 2015 he had two boils "that started everything off.  I had a few more boils after that, before the summer, and then after the summer it was just clusters of bumps.  I didn't have a large single boil after that."  (ECF No. 152-12, p. 42).   Plaintiff testified he has not had any bumps or boils since the summer of 2018.  (ECF No. 152-12, pp. 36-37).

Beginning in January of 2016, Plaintiff began to have bouts of nausea and vomiting and was running fever.  *Id.* at pp. 40-41.  "It would usually last a day, two days.  Sometimes I'd go a couple of weeks between it; sometimes it would be a few months…"  *Id.* at p. 41.

Plaintiff states his eye irritation and pain has been constant from November of 2014 until the present with two exceptions, once in December of 2016 and again in December of 2017.  In December of 2016, Plaintiff put in a sick call.  "My right eye had entirely turned red.  I went in and they found a scratch on my eye…Dr. Vowell prescribed antibiotic eye drops…The antibiotic drops worked… after the drops ran out, all of the eye irritation came back…Dr. Vowell re-prescribed them in January…the exact same thing happened."  (ECF No. 152-12, pp. 47-48).  He

18

states the "[redness] has not been continuous. The pain and irritation has been continuous." *Id.* at p. 49.

Plaintiff admits he has had a prescription for eye drops since December of 2014 or January of 2015 but claims he told Defendants Vowell and Gifford the drops were "not sufficient, that they were not helping the problem." (ECF No. 152-12, pp. 49-50). Plaintiff also acknowledges he was sent to the Jones Eye Clinic by Defendant Vowell for evaluation by an ophthalmologist where he was diagnosed with dry eyes. (ECF No. 152-12, p. 58). When asked about his vision now he states he has to wear reading glasses and his vision varies day to day "because of the irritation and the buildup of blurry stuff I get in my eyes but after I use eye drops and my eyes are clear, its's good. I see well." *Id.* at 29.

Plaintiff states Defendant Vowell should have "continued to figure out what the problem was and take care of it…She could have tested me for an infection. She could have tested me for, I don't know, all kinds of things." *Id.* at pp. 60-61. Plaintiff admits he did undergo regular and complete blood tests every three to six months which would show his white blood count. (ECF No. 152-12, p. 61). But he states, "It's just a standard blood work. It's not a test for infection." *Id.* on p. 62. He admits his white blood count could be an indicator of the presence of an infection but "its not a definitive test for infection by any means." When asked what a definitive test for infection would be, he replied, "I don't know. I'm not a doctor." *Id.* Plaintiff testified he believes all his symptoms are related and are likely the result of a bacterial infection since antibiotics have worked. "That's the only guess I can make and that's the only evidence I have to base anything on since they won't tell me anything. They won't do any diagnostic test…I just want them to do something as opposed to nothing. (ECF No. 152-12, pp. 63-64).

Plaintiff acknowledges Defendant Gifford is not authorized to prescribe treatment such as antibiotics. *Id.* at p. 65.  Plaintiff claims she has "sent back sick calls and didn't do anything" which he claims violated his constitutional right to adequate medical care. *Id.* at p. 68.  He states there were other occasions when Defendant Gifford would see me and she "did not honestly or fully report my problems." *Id.* at p. 88.  He summarizes his claims against Gifford as, "… I repeatedly entreated her to help me…do something about these conditions, and nothing happened." (ECF No. 152-12, p. 100).  He states on March 5, 2015, Defendant Gifford "suggested that my problems were not real by stating that I needed a mental health referral on a sick call for, I believe – I don't remember if that was one I was seen or not seen on, but … In 2015 on March 18th, I was seen and she took no steps to correct the problem.  On June 23, 2015 she saw me for a boil and she did nothing." *Id.* at pp. 102-103.    Plaintiff also testified Gifford told him he was causing problems and from that point on she made him fill out separate sick calls for each symptom and recorded him as a no show for sick call on November 5, 2016. He testified, "In every case where I'm claiming retaliation, it was that she [Defendant Gifford] was denying me care…that was basically her only means of retaliating."  (ECF No. 152-12, p. 111).

As to Defendant CCS, Plaintiff testified, "The reason they're included in the lawsuit is a failure to – when I have complained about things to a higher level…when I've had grievances go to their ombudsman, when I've tried to seek recourse beyond Ms. Gifford and Dr. Vowell, they've shut me down…They've done absolutely nothing."  Plaintiff states even when he filed grievances found to have merit, CCS refuses to act.  "Dr. Vowell and Ms. Gifford are the last word, and I can't get any relief beyond that."  (ECF No. 152-12, p. 126).  Plaintiff goes on to say, "I'm not objecting to a policy.  I'm objecting to the practice of doing nothing." *Id.*

Plaintiff also states Plaintiff is suing CCA because they "changed the policy on hearing aid batteries…it made it much more difficult to receive them.  And I went weeks at times without hearing aid batteries based solely on their new policy, which they've now reserved to go back to the old policy, so now I receive them - I don't have any problem with it."  *Id.* at 132.  He states this went on over a period of approximately two years.  He also claims there was a delay in getting one of his hearing aids repaired and returned to him.  *Id.* at p. 136.  He admits, "at all times, I had at least one hearing aid in my possession but not one that was functionally useful."  (ECF No. 152-12, pp. 138-139).  He states although it was "pointless", sometimes he wore the hearing aid and "sometimes I didn't."  *Id.* at p. 139.

Although he does not specifically remember the appointment, Plaintiff admits he may have been seen by an optometrist in January of 2015.  He does recall being seen by an optometrist in December of 2016.  He was also seen by an ophthalmologist at the Jones Eye Institute at UAMS in January of 2017. *Id.* at pp. 129-130.  Plaintiff was also seen by Dr. Breving, a gastroenterologist, who performed an upper endoscopy sometime between 2015 and the time Plaintiff filed this lawsuit.  According to Plaintiff, the results were inconclusive as to whether he has a condition known as Barrett's esophagus, a serious complication of Plaintiff's acid reflux.  (ECF No. 152-12, p. 131).

As for Defendant Vowell, Plaintiff states, "I'm saying she denied me care.  She refused to do anything.  I'm not saying her judgment was wrong when she did do something."  Plaintiff admits Defendant Vowell prescribed Simethicone for pains in his stomach, and he thinks she prescribed Flomax for him.  She also referred him to the ophthalmologist and the gastroenterologist.  (ECF No. 152-12, p. 141).  However, Plaintiff claims Defendant Vowell

delayed making his appointment with the ophthalmologist for over a month after the optometrist said he needed to be seen. *Id.* at 177.   In March of 2015, Plaintiff states Defendant Vowell "essentially stopped treating me, stopped trying to figure out what the problem was, stopped doing – she didn't initiate any sort of diagnostic measures.  She didn't even talk to me, ask me what was wrong.  She did nothing." *Id.* at p. 142.  Plaintiff also testified on November 12, 2015, Defendant Vowell examined Plaintiff's right eye after he complained of irritation.  (ECF No. 152-12, p. 171. Plaintiff claims she didn't examine him properly – briefly looking at his eye with a flashlight and "refused to allow me to say anything about anything after that…".  *Id.*  Plaintiff does acknowledge Defendant Vowell used Tetracaine to numb his eye in order to examine him on that date.

Plaintiff testified his claims regarding blood work are against Defendant Vowell.  He states on 11/4/15, 2/5/16, 4/6/16, 5/11/16, and 8/2/16 he had "various problems with my red blood cell count".  Plaintiff states Defendant Vowell didn't follow up on the blood work to see what was wrong. *Id*. at p. 174.

Plaintiff testified, "No one has diagnosed any condition [relating to his symptoms] whatsoever except the ophthalmologist telling me I have dry eyes.  That's the problem.  There has been no diagnosis for anything.  That's what I'm seeking...I filed this lawsuit to get whatever is causing me these problems taken care of…so I can just go back to my reading and go on with life." (ECF No. 152-12 p. 145).  Plaintiff testified [his symptoms] "could be cancer.  It could be any kind of thing.  I think it's probably just bacterial and nothing serious, but it might be something more serious, but I don't know because no diagnostic steps have been taken."  (ECF No. 152-12, pp. 151-152).

Plaintiff admits he has been provided with cream for his rashes between 2015 and 2017 but

22

he may have been without the cream for a period of six months or so.  He also states Defendant Vowell "did the stiches" and prescribed the antibiotic Cephlex when he cut himself in August of 2015 and this made all his symptoms disappear only to return after he was no longer taking the antibiotics.  *Id.* at pp. 149-150, 168.

### III. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor."  *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."  *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

23

# IV. DISCUSSION

## A. Denial of Medical Care

Plaintiff alleges Defendants were deliberately indifferent to his medical needs beginning in 2015. The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to the serious medical needs of prisoners. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious'." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Long*, 86 F.3d at 765).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany,* 132 F.3d at 1239). To show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*,

638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).  To establish the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.  Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct."  *Popoalii v. Correctional Medical Services,* 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).  This is an "onerous standard," *Thompson v. King,* 730 F.3d 742, 747 (8th Cir. 2013), requiring a prisoner to "clear a substantial evidentiary threshold". *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir. 2010).  A plaintiff must show that an official "actually knew of but deliberately disregarded his serious medical need."  *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006).  However, intentionally denying or delaying access to medical care may constitute deliberate indifference.  *See Dulany*, 132 F.3d at 1239.

## 1.  Objectively Serious Medical Needs

Defendants have submitted affidavits from two medical experts who state they reviewed Plaintiff's medical records from January 1, 2015 through May of 2019, and in their opinion, Plaintiff had no serious medical needs between January 1, 2015, and May 4, 2017.  (ECF Nos. 152-13, 152-14).  Perhaps even more compelling are Plaintiff's own words when he admits in his deposition his symptoms are probably "nothing serious".  (ECF No. 152-12, pp. 151-152).

However, Plaintiff has been diagnosed with dry eyes and hearing loss by physicians.[5] Therefore, the Court considers these conditions as objectively serious medical needs.  As discussed in detail below, the Court does not find any of Plaintiff's other medical issues to be serious medical

---

[5] Plaintiff has also been diagnosed with chronic acid reflux.  However, Plaintiff is not asserting any claims in this lawsuit based on this condition.

needs.

As previously stated, Plaintiff claims he also suffers from a "frequently debilitating and always painful condition (likely bacterial infection, MRSA)" which Defendants have failed and refused to diagnose and properly treat.  (ECF No. 14, pp. 4-8).  His symptoms of infection, as set forth in his Second Amended Complaint include the following: constant pain in tissues of face and head; frequent, usually daily headaches, mild to severe; excessive thirst; difficulty swallowing; recurrent boils and bumps on face; recurrent swelling of eyelids; earaches; muscle weakness and pain; shortness of breath; persistent and recurrent rashes; urine irregularities, poor blood work labs; bouts of nausea, constant eye pain and irritation; build-up of irritants under eyelids resulting in sleep deprivation; blurred, cloudy and dimmed vision; constant sinus trouble; recurring cough; recurring sore throat; edema on arms.  *Id.*  Plaintiff also claims his abnormal blood lab results were not followed up on by Defendant Vowell and she denied him care when she refused to send him to an orthopedic surgeon for evaluation of his right ankle that was shattered back in 2008.

Although perhaps uncomfortable, the Court finds none of the symptoms described by Plaintiff as evidence of a potential infection rise to the level of "serious" medical needs.  Courts have addressed similar symptoms experienced by Plaintiff and determined they are not sufficiently serious to trigger liability under § 1983.  *See Martinson v. Leason,* 22 F. Supp. 3d 952, 963 (D. Minn. 2014) (diarrhea, cough, bloody sputum, and other cold-like symptoms did not constitute serous medical need); *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (holding that breathing problems, chest pains, dizziness, sinus problems, headaches, and loss of energy are, objectively speaking, relatively minor, and not sufficiently serious to be constitutionally actionable); *Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990) (swollen wrists are not a serious

medical need); *Williams v. Cook,* 2009 WL 708535 at *3 (E. D. Ark. March 16, 2009) (dry skin is

not a serious medical need); *Spann v. Correctional Medical Services,* 2006 WL 2423107 at *5 (W.

D. Mo. Aug. 21, 2006) (dry skin is "a universal problem by prisoners" and not a serious medical

need); *Johnson v. Vondera*, 790 F. Supp. 898, 900 (E.D. Mo. 1992) (headaches, neck pain and

blurred vision did not establish a serious medical need for specific treatments); *Borrelli v. Askey,*

582 F. Supp. 512, 513 (E.D. Pa. 1984) (slight vision impairment causing mild headaches and mild

tension is not a serious medical need).

Based on the summary judgment record, the Court finds Plaintiff's blood lab results,

alleged urine irregularities and his previously injured right ankle do not constitute serious medical

needs.  The medical records confirm none of the lab results from Plaintiff's numerous blood tests

showed any significantly abnormal results and the ORCU's medical staff monitored his blood

count every three to six months.  Likewise, alleged "urine irregularities" are not supported by the

record.  A urinalysis was done showing no unusual odor and no infection.  In addition, Plaintiff's

right ankle, injured six (6) years before he was transferred to the ORCU, is not a serious medical

need that is an excessive risk to his health.  Plaintiff has not presented any evidence to indicate the

condition of his right ankle has declined since he was transferred to the ORCU.  In addition,

Plaintiff effectively utilizes a wheelchair and he testified during his deposition he is able to put

weight on his left ankle and use it to move around.

Finally, it is clear from Plaintiff's pleadings he disagrees with almost every aspect of the

medical care he has been provided by Defendants.  Plaintiff's main complaint – that Defendants

have failed to diagnose and treat his medical condition - does not state a valid claim of medical

mistreatment under the Eighth Amendment.  *Whitney v. Albers*, 475 U.S. 312, 319 (1986).  The

Eighth Circuit has "repeatedly held that a prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail to rise to the level of a constitutional violation." *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990) (prisoner's disagreements on location of rehabilitation for burn injuries, amounts of pain medication, and frequency of bandage changes failed to state deliberate indifference); *Taylor v. Turner*, 884 F.2d 1088, 1090 (8th Cir. 1989) (prisoner's disagreement about treatment for mental deficiency, surgery for hernia, hearing deficiency, and nutritional deficiency found insufficient); *Lair v. Ogelsby*, 859 F.2d 605, 606 (8th Cir. 1988) (mere disagreement about which medication should have been prescribed does not constitute an Eighth Amendment violation); *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985) (prisoner's disagreement about treatment of pain in his lower back and arm did not constitute an Eighth Amendment violation).

As noted above, Plaintiff's only objectively serious medical needs are dry eyes and hearing loss. None of Plaintiff's other medical conditions qualify as objectively serious medical needs and therefore Defendants' Motion for Summary Judgment should be granted as to those claims. As for Plaintiff's dry eyes and hearing loss claims, the Court will next consider the second prong of the analysis - whether Defendants were deliberately indifferent to these serious medical needs.

### 2. Delay in Providing Medical Care

Before addressing whether Defendants were deliberately indifferent to Plaintiff's serious medical needs, the Court will address Plaintiff claims related to a delay in providing medical care.

Plaintiff alleges a delay in providing him with scripts for a double mattress and a pillow, the medications Simethcone and Absorbase, and a functional hearing aid and batteries violated his right to medical care. He also alleges Defendant Vowell's delay in reviewing the optometrist's

recommendation and the subsequent delay in making him an appointment with the ophthalmologist violated his rights.

When a delay in medical treatment is the alleged constitutional deprivation, the objective seriousness of the deprivation, must also be measured by reference to the effect of delay in treatment. As a result, to succeed on a delay in medical treatment claim, the plaintiff "must place verifying medical evidence in the records to establish the detrimental effect of delay in medical treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (quotation marks omitted) (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)). On summary judgment, a plaintiff must offer evidence a delay in treatment had a detrimental effect. In the absence of such evidence, a plaintiff "fail[s] to raise a genuine issue of fact on an essential element of his claim." *Id.*

Although Plaintiff's alleges conclusory statements of harm, he has not submitted any verifying medical evidence to establish any delay in providing him with a double matt, extra pillow, medications, hearing aids or working batteries caused any actual harm or that the delay caused a significant risk of serious harm to his health. Likewise, there is no evidence the one-month delay in being referred to the ophthalmologist caused Plaintiff any harm. Thus, Plaintiff has not submitted evidence to survive summary judgment on his claim for delayed medical treatment.

### 3. Deliberate Indifference to Serious Medical Needs

As previously stated, Plaintiff's hearing loss is a serious medical need. Plaintiff claims Defendants were deliberately indifferent to his needs by delaying the repair and replacement of one of his hearing aids and delaying replacement of hearing aid batteries. Based on the summary

judgment record, the Court finds Defendants were not deliberately indifferent to Plaintiff's hearing loss.   Plaintiff was issued batteries on a consistent basis, examined by providers when he complained of hearing issues, referred to an outside audiologist on several occasions, and fitted for hearing aids.   In addition, Plaintiff admits in his deposition he had at least one hearing aid at all relevant times.   Although Plaintiff disputes he received a properly functioning hearing device during the time in question and generally disputes the adequacy of his care, he has not provided any evidence which gives rise to a genuine issue of fact.   *See Delaney*, 132 F.3d at 1240 (holding in the face of medical records indicating treatment was provided and physician affidavits indicating treatment was adequate, a plaintiff may not create a question of fact simply by alleging he did not feel the treatment was adequate.)   Because Plaintiff has not supplied evidence demonstrating a fact issue as to his claim Defendants were deliberately indifferent to his serious medical need of hearing loss, Defendants are entitled to summary judgment on this claim.

Plaintiff also suffers from a condition known as dry eyes.   Plaintiff testified in his deposition he has had a prescription for eyes drops since 2014.   During his incarceration in the ORCU, Plaintiff was seen by an optometrist on two occasions and was referred to and evaluated by an ophthalmologist in January of 2017 where he was diagnosed with "dry eyes".   The medical records confirm he was also provided antibiotics on two occasions for eye irritation.   He was also provided with lubrifresh and fish oil for his condition.   There is no evidence Plaintiff's vision has been damaged in any way from his dry eyes.   Plaintiff testified in his deposition when he uses his eye drops he "sees well".   He also states without reading glasses, his visual acuity is close to 20/20 in both eyes.   "My distance vision is not a problem. It's only for reading that I have any issues whatsoever."  (ECF No. 152-12, p. 29).   Accordingly, the Court finds Plaintiff has not offered any

summary judgment evidence demonstrating a fact issue as to his claim Defendants were deliberately indifferent to his serious medical need of dry eyes.    Defendants are entitled to summary judgment on this claim.

As a final point, even if the Court assumes, *arguendo,* all of Plaintiff's other complaints and symptoms are serious medical needs, the Court finds no evidence of deliberate indifference. The summary judgment record contains over eighteen hundred (1800) pages of medical records documenting Plaintiff's medical care and treatment during his time in the ORCU.   Plaintiff received medical examinations and care on a very regular basis.   In fact, the medical records also confirm Defendants time and time again evaluated Plaintiff and used their professional medical judgment in determining his treatment.    As previously stated, Plaintiff's disagreement with his treatment does not state a constitutional claim.

Courts "hesitate to find an [E]ighth [A]mendment violation when a prison inmate has received medical care." *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990).  On the facts presented here, the Court concludes while Plaintiff may not have received *perfect* care from Defendants, the care he received was constitutionally sufficient.  *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (Eighth Amendment does not require that prisoners receive "unqualified access to health care"); *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991) ("[I] is not constitutionally required that" care be "perfect, the best obtainable, or even very good.")  (citation omitted); *Schaub v. VonWald,* 638 F.3d 905, 935 (8th Cir. 2011) (Beam, J., dissenting) ("[I]nmates are only entitled to adequate medical care, not the best care possible.") (internal quotation marks and citation omitted).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims he was denied adequate medical care.

**B.  Retaliation**

Plaintiff alleges Defendants Vowell and Gifford retaliated against him for filing multiple grievances and sick calls by continuing to deny him medical care by failing to renew and delay some of his medications.id, listing him as a no show for day clinic sick call, and requiring him to strip to his boxer shorts to be examined on one occasion.

The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity.  *Dixon v. Brown*, 38 F.3d 379 (8th Cir. 1994).  In general, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason."  *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001) (citing *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990)).  The retaliatory conduct itself need not be a constitutional violation in order to be actionable.  Additionally, there is no independent injury requirement when retaliatory conduct is involved.  *See Dixon*, 38 F.3d at 380.

To prevail on his retaliation claim, Plaintiff must demonstrate: (1) he engaged in protected activity; (2) Defendants responded with adverse action that would "'chill a person of ordinary firmness' from continuing in the activity;" and (3) the adverse action was motivated at least in part by exercise of the protected action.  *See L.L. Nelson Enterprise Inc. v. County of St. Louis, Mo.,* 673 F.3d 799, 807-8 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).

First, there is no question Plaintiff engaged in a protected activity when he submitted medical requests and grievances.  However, as to the second part of this analysis, the fact Plaintiff continued to file dozens of grievances and medical requests after Defendants Vowell and Gifford allegedly retaliated against him demonstrates their conduct did not "chill" Plaintiff from

continuing in the protected activity.  In addition, Plaintiff has not presented any summary judgment evidence to support his actual retaliation claims.  *See Meuir v. Greene County Jail Emples.,* 487 F.3d 1115, 1119 (8th Cir. 2007) ("Merely alleging that an act was retaliatory is insufficient."). Considering the summary judgment record, Plaintiff has failed to establish he actually suffered any adverse action.  *See Murphy v. Mo. Dept. of Corr.,* 769 F.2d 502, 503 n. 1 (8th Cir. 1985) (holding an inmate bears a heavy evidentiary burden in establishing a prima facie retaliation case).

Accordingly, Plaintiff's claims for retaliation fail as a matter of law and Defendants Vowell and Gifford should be granted summary judgment on this issue.

### C.  Official Capacity Claims

Plaintiff also sues Defendants in their official capacity.  Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010).  Likewise, when a government contracts with a third-party to fulfill a constitutional duty – such as providing medical care - official-capacity claims against the third-party's employees are treated as claims against the third-party itself. *See Cannady v. Cradduck*, 2016 WL 4432704, at *1-*2 (W.D. Ark. Aug. 18, 2016) (finding that official-capacity claims against employees of a third party medical provider are treated as claims against the company because Benton County contracted with the company to provide healthcare to County prisoners"). To sustain an official-capacity claim against such an entity a plaintiff "must show that there was a policy custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006) (involving a § 1983 claim against a prison medical provider); *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993) ("[A] corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional

policies."). Thus, Plaintiff's official-capacity claims against Defendants Vowell and Gifford are "functionally equivalent" to alleging their employer, CCS, had "a policy, custom, or [took an] official action" that deprived him of constitutionally adequate medical care. *Veatch,* 627 F.3d at 1275*; Johnson*, 452 F.3d at 973.

Plaintiff alleges the cost-cutting policies of CCS discouraged Defendants Vowell and Gifford from pursuing diagnostic tests and treatment for his medical conditions.  He also claims CCS failed to act when he pleaded with them to provide medical care.  In addition, he asserts CCS's hearing aid battery replacement policy caused him to suffer unnecessary delays in receiving the batteries.  Here, Plaintiff has failed to produce evidence of any policy or custom of CCS that contributed to the alleged violation of Plaintiff's constitutional rights.  Plaintiff's allegations concerning official capacity merely consist of a recitation of the ways he believes his constitutional rights were violated by the individual actions, or lack thereof, by Defendants CCS, Vowell and Gifford.  Accordingly, because Plaintiff has failed to supply any summary judgment evidence of a policy, custom, or official action by CCS, Plaintiff has failed to state a claim against Defendants in their official capacities.

### D.  State Law Claims under the Arkansas Medical Malpractice Act

The Court's subject matter jurisdiction in this action is premised on the existence of a federal claims – namely, the deliberate indifference to Plaintiff's medical needs and retaliation. Jurisdiction over the negligence claim under the Arkansas Medical Malpractice Act exists solely by virtue of the supplemental jurisdiction statute, 28 U.S.C. § 1367, which provides jurisdiction over state law claims forming part of the same "case or controversy" as federal claims.

But the exercise of supplemental jurisdiction is discretionary, and where all federal claims have been dismissed prior to trial, the factors to be considered in deciding whether to exercise such jurisdiction – judicial economy, convenience, fairness, comity, and predominance of state issues – typically go against doing so.  *Johnson v. city of Shorewood, Minn.,* 360 F.3d 810, 819 (8th Cir. 2006) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  *Accord, e.g., United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").  Accordingly, the Court should decline to exercise supplement jurisdiction over Plaintiff's state law claim for medical malpractice and dismiss the claim without prejudice. *See* 28 U.S.C. § 1367(c)(3) (recognizing a district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction").

## V. CONCLUSION

For the reasons stated above, I recommend Defendants' Motion for Summary Judgment (ECF No. 151) be **GRANTED.**  I recommend Plaintiff's individual and official capacity claims against Defendants CCS, Vowell and Gifford for denial of medical care and retaliation under 42 U.S.C. § 1983 be **DISMISSED WITH PREJUDICE.**  I also recommend Plaintiff's state law claims for medical malpractice be **DISMISSED WITHOUT PREJUDICE.**

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are**

reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 11th day of September 2019.

/s/ *Barry A. Bryant*

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

36